**Electronically Filed
Intermediate Court of Appeals
CAAP-20-0000603
29-JAN-2025
08:15 AM
Dkt. 153 OP**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

DAVID KIMO FRANKEL, Plaintiff-Appellant, v.
BOARD OF LAND AND NATURAL RESOURCES, DEPARTMENT OF LAND AND
NATURAL RESOURCES AND RESORTTRUST HAWAII LLC,
Defendants-Appellees.

NO. CAAP-20-0000603

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 1CC181001959)

JANUARY 29, 2025

NAKASONE AND MCCULLEN, JJ., WITH HIRAOKA, PRESIDING JUDGE,
CONCURRING IN PART AND DISSENTING IN PART

OPINION OF THE COURT BY MCCULLEN, J.

Simply put, this case is about whether the State of

Hawai'i fulfilled its trust duty regarding the ceded land at

issue here, "Lot 41."

To have a deeper understanding of the State's duty as

to Lot 41, some historical context is necessary. Historically,

"[l]and and natural resources were not privately owned.  Rather, the Hawaiian people maintained a communal stewardship over the land, ocean, and all of the natural resources of the islands." Melody Kapilialoha MacKenzie, Historical Background, in Native Hawaiian Law: A Treatise 6-7 (Melody Kapilialoha MacKenzie et al. eds. 2015); see Ching v. Case, 145 Hawaiʻi 148, 177 n.49, 449 P.3d 1146, 1175 n.49 (2019) ("To native Hawaiians, land is not a commodity; . . . [it] is part of their ʻohana, and they care for it as they do for other members of their families." (citations omitted)).

Western contact changed that.  Following the overthrow of the Hawaiian Kingdom in 1893 and annexation by the United States in 1898, the crown and government lands of Hawaiʻi were ceded to (or taken by)[1] the United States.  MacKenzie, supra, at 24, 27; Ching, 145 Hawaiʻi at 176-77, 449 P.3d at 1174-75 (chronicling the transfer of ceded lands during Hawaii's kingdom, republic, territorial, and statehood eras).  In 1959, those crown and government lands were returned to Hawaiʻi, and as explained more fully below, are held in trust by the State.

---

[1]  Of course, as with history in general, it depends on whose historical narrative prevailed.  See State v. Wilson, 154 Hawaiʻi 8, 21, 543 P.3d 440, 453 (2024) ("History is messy.  It's not straightforward or fair.  It's not made by most.").

MacKenzie, supra, at 32; Ching, 145 Hawaiʻi at 176-77, 449 P.3d at 1174-75.

We hold that the State, through Defendant-Appellee the **Board** of Land and Natural Resources (or **BLNR**), did not fulfill its duty regarding Lot 41, which is part of the returned crown and government lands (or ceded lands) the State holds in trust.

### I.    BACKGROUND

**A.    Factual Background**

In 1963, four years after the crown and government lands were returned, the State entered into an agreement with the Kahala Hilton Hotel, Charles J. Pietsch, Jr., and David T. Pietsch (collectively, **Kahala Hotel**)[2] to allow Kahala Hotel to "dredge a swimming area and construct a beach . . . for and on behalf of the State."  The agreement provided that "[t]itle to and ownership of all filled and reclaimed lands and improvements seaward of the makai boundaries . . . shall remain in and vest in the State of [Hawaiʻi] and shall be used as a public beach." (Emphasis added.)

This newly constructed beach and swimming area (**Lot 41**) is part of the returned crown and government lands.

---

[2]  The Waialae Country Club and the Bishop Estate Trustees were also parties to the agreement, but they appear to be nominal parties based on the filings below and on appeal.

In 1968, shortly after completion of Lot 41, the Board granted a temporary month-to-month permit for one year to Kahala Hotel allowing it "to enter and occupy" 6,250 square feet of Lot 41 for "[r]ecreational purposes." The Board granted these temporary month-to-month yearly permits for the next 50 years.[3]

B.   **Procedural Background**

   1.   **Board Proceedings**

In June 2018, **Sierra Club** of Hawaiʻi sent a letter to the Board raising several issues related to Kahala Hotel's use of Lot 41. Among the issues Sierra Club asked the Board to consider was the State's public trust duty.

In July 2018, Hawaii's Thousand Friends sent a letter to the Board also raising the public trust issue:

---

[3]   Hawaiʻi Revised Statutes (**HRS**) § 171-55 (2011) allows the Board to grant temporary occupancy of State lands on a month-to-month basis not to exceed one year, but may allow a permit to continue for additional one-year periods:

> Notwithstanding any other law to the contrary, the board of land and natural resources may issue permits for the temporary occupancy of state lands or an interest therein on a month-to-month basis by direct negotiation without public auction, under conditions and rent which will serve the best interests of the State, subject, however, to those restrictions as may from time to time be expressly imposed by the board. A permit on a month-to-month basis may continue for a period not to exceed one year from the date of its issuance; provided that the board may allow the permit to continue on a month-to-month basis for additional one[-]year periods.

Whether renewing Kahala Hotel's permit for 50 years as a "temporary occupancy" is proper under this statute is not an issue before us.

> In this era of climate change and rising seas the Department and Board's obligation under the Public Trust Doctrine and State Constitution (Article XI, Section 1) to ". . . conserve and protect Hawaiʻi's natural beauty and all resources, including land, water . . ." because "All public natural resources are held in trust by the State for the benefit of the people" is even more critical.

(Emphasis added.)

In August 2018, the new owner of Kahala Hotel, Defendant-Appellee **Resorttrust** Hawaii (or **RTH**), requested to amend its permit for Lot 41, which granted it use of 40,460 square feet. The request recounted some of the history of the Kahala Hotel's use of Lot 41, noting that the Board granted Kahala Hotel use of the entire parcel in 1986; the parcel served as a "buffer zone" between the sandy beach and hotel; and the parcel was used for "hukilaus," parties, weddings and other "important events," with public access along the side of the parking structure and by the shoreline. The request explained Resorttrust's attempt to take "corrective action" and "substantially reduce" its use of Lot 41.

Resorttrust identified five categories of encroachment: (1) storage of recreational items; (2) restaurant seating; (3) outdoor seating; (4) shower and recreational facilities, and (5) roof overhang. Resorttrust did not identify or discuss possible alternatives to using ceded land for these encroachments in its request.

### (a)  September 2018 Board Meeting

On September 14, 2018, the Board held a meeting to consider Resorttrust's request.  Department of Land and Natural Resources (**DLNR**) staff submitted an eight-page report with recommendations and numerous attachments regarding Resorttrust's request to the Board.  This submittal indicated the land subject to Resorttrust's request was zoned as urban, and described the "trust land status" as "Section 5(b) lands of the Hawaii Admission Act."[4]

---

[4]  Section 5(b) of the Admission Act was the vehicle through which the federal government returned crown and government lands to the newly formed State of Hawaiʻi, and section 5(f) required those lands to be held in trust:

> (b) Except as provided in subsection (c) and (d) of this section, the United States grants to the State of Hawaii, effective upon its admission into the Union, the United States' title to all the public lands and other public property, and to all lands defined as "available lands" by section 203 of the Hawaiian Homes Commission Act, 1920, as amended, within the boundaries of the State of Hawaii, title to which is held by the United States immediately prior to its admission into the Union.  The grant hereby made shall be in lieu of any and all grants provided for new States by provisions of law other than this Act, and such grants shall not extend to the State of Hawaii.
>
> . . . .
>
> (f) The lands granted to the State of Hawaii by subsection (b) of this section . . . together with the proceeds from the sale or other disposition of any such lands and the income therefrom, shall be held by said State as a public trust for the support of the public schools and other public educational institutions, for the betterment of the conditions of native Hawaiians, as defined in the Hawaiian Homes Commission Act, 1920, as amended, for the development of farm and home ownership on as widespread a basis as possible for the making of public improvements, and for the provision of lands for public use.  Such lands,

(continued . . .)

As justification for the permit, the staff submittal provided that (1) a permit was needed to regulate Kahala Hotel's activities, (2) the Property was unsuitable for public auction lease, and (3) Resorttrust withdrew its draft environmental assessment due to community concerns:

> JUSTIFICATION FOR REVOCABLE PERMIT:
>
> A land disposition is needed to regulate the hotel's improvements and activities at the subject location, and a revocable permit is able to meet this objective as supported by the following justifications.
>
> A. Site issues make property unsuitable for public auction lease:
>   - No legal vehicular access.
>   - Irregular shape.
>   - The requested location and other portions of State unencumbered lands in the vicinity are not legally subdivided lots.
>
> B. Since RTH became the owner of the hotel around 2014, its representative approached the Land Division discussing the possibility of obtaining an easement for some of the hotel's activities and improvements. RTH published a draft environmental assessment ("DEA") pursuant to Chapter 343, [Hawaiʻi Revised Statutes (**HRS**)] in the summer of 2017, but decided to withdraw the DEA in August 2017 due to community concerns and maintain the current revocable permit.

(Formatting altered.)

The staff submittal reiterated some of the community's concerns and noted the June 2018 letter from Sierra Club was

---

(. . . continued)

> proceeds, and income shall be managed and disposed of for one or more of the foregoing purposes in such manner as the constitution and laws of said State may provide, and their use for any other object shall constitute a breach of trust for which suit may be brought by the United States. . . .

The Admission Act, 1959, Pub. L. No. 86-3, § 5(b), 73 Stat. 4, reprinted in 1 HRS at 136-37 (2009) (emphasis added).

attached, but did not mention that Sierra Club raised a public trust issue. The staff submittal detailed the list of items Resorttrust requested to place on Lot 41, including a storage area, cabana hale, cabana tents, shower, outdoor restaurant seating area, hammock, trash cans, beach chair storage, beach chairs, and outrigger canoe storage.

The staff submittal clarified why individuals may have trouble distinguishing between hotel property and State land:

> [T]here is a continuous stretch of landscaped area along the Kahala Beach from Diamond Head side to Koko Head direction maintained by RTH. As a result, depending on the exact location, it may be difficult to distinguish whether an individual is physically standing on the hotel property or the State land [revocable permit] area.

(Internal brackets omitted.)

The staff submittal also explained that Resorttrust installed public access signs, attended neighborhood board meetings to share information, maintained Kahala Beach as part of its operations, and agreed to continue maintaining Kahala Beach.

In their recommendation to the Board, the staff considered HRS Chapter 343[5] and Hawaiʻi Administrative Rules

---

[5] The Hawaiʻi Environmental Policy Act (**HEPA**), as codified in HRS Chapter 343 and implemented by HAR Chapters 11-200.1 and -201, establishes an environmental review process that assesses the environmental, social, cultural, and economic impacts of proposed projects or programs prior to their implementation. HEPA also aims to increase public participation throughout the environmental review process. HRS § 343-1 (2010).

(**HAR**) Chapter 11-200[6] and determined the project would "probably have minimal or no significant effect on the environment[.]" The staff thus concluded the project was exempt from preparing an environmental assessment and recommended issuing the permit for "recreational and maintenance purposes" with certain conditions.

Plaintiff-Appellant David Kimo **Frankel** submitted eleven pages of written testimony regarding the permit request. Frankel raised the State's public trust duties regarding Lot 41, among other issues.  He also requested a contested case hearing.

The Board deferred its decision on the revocable permit pending receipt of Frankel's contested case petition.

**(b)   November 2018 Board Meeting**

The Board met again on November 9, 2018.  DLNR staff submitted a two-page report with recommendations and numerous attachments for the meeting.  In the report, DLNR staff recommended denying Frankel's request for a contested case hearing.  The staff then reiterated their September 2018 recommendations.

The Board approved the revocable permit as DLNR staff recommended with additional conditions, including: (1) Resorttrust "will obtain the necessary permits or approvals

---

[6]  On December 18, 2018, HAR § 11-200 was repealed and HAR § 11-200.1 was adopted.

for the uses allowed under this new permit"; (2) "[p]ublic access shall be allowed in the permit area, to the extent the area is not in use as allowed by the Revocable Permit"; (3) "[t]here shall be two (2) twenty feet wide clear pathways for public access/walkway"; (4) restaurant overflow seating should not exceed fourteen days annually; and (5) "[n]o weddings, surf lessons or kayaking/boating activities" are allowed in the permitted area.

Two days prior to the hearing, Frankel submitted written testimony explaining he could not attend in person.[7] In his written testimony, Frankel again raised concerns about the Board's "compliance with its public trust duties[.]"[8]

**(c)  Permit Issued**

The ten-page permit was executed on January 29, 2019, but retroactive to January 1, 2019.  The permit was for "[r]ecreational and maintenance purposes limited to storage area, cabana hale, cabana tent, beach shower, tower caddy, hammock, trash can, beach chair storage, clam shell lounger, beach chair set up, and outrigger canoes storage."  The permit established monthly rent at $1,320.05, which could increase to

---

[7]  Agenda Item D-17: Annual Renewal of Revocable Permits on the Island of Oahu, Meeting Before the Board of Land and Natural Resources (Nov. 2018), at 37–38 (written testimony of David Kimo Frankel), https://dlnr.hawaii.gov/wp-content/uploads/2018/11/D-17T-18T-19T.pdf [https://perma.cc/G7KB-PB8Z].

[8]  Id.

$6,300.00 or 3% of gross monthly revenues, whichever was greater, as well as other financial details.

The permit stated "beach chairs, umbrellas, shade devices, mats, towels, and personal recreational equipment are permitted on the Premises as long as the user is physically present or such items have been placed on the Premises at the request of the user." (Emphasis added.) It further instructed, "[e]xcept as otherwise provided herein, the Permittee shall not engage in any presetting of any equipment on the Premises." (Emphasis added.)

The permit required Resorttrust establish and maintain two twenty-foot-wide pathways for public access. It further mandated public access "to the extent the area is not occupied for a use allowed under the Permit." The permit prohibited "weddings, surf lessons, or kayaking/boating activities" on Lot 41.

## 2. Circuit Court Proceedings

### (a) Frankel's Complaint

Frankel filed a four-count complaint in the Circuit Court of the First Circuit in December 2018. Under Count 4 (Breach of Trust Duties), the only count relevant to this appeal, Frankel asserted procedural and substantive allegations:

> 96. BLNR must fulfill public trust duties when it manages and renders decisions regarding ceded land.

97.   Any balancing between public and private purposes must begin with a presumption in favor of public use, access and enjoyment.

98.   BLNR may compromise public rights in resources pursuant only to a decision made with a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state.

99.   BLNR has a trust duty to respond to a permittee's violations of the law and noncompliance with a permit on public trust ceded land.

100.  HRS § 171-7 mandates that BLNR shall prevent illegal activities on public land and enforce permits of public land.

101.  HRS § 171-6(14) and (15) authorizes BLNR to set, charge and collect additional rentals and fines for the unauthorized use of public lands by a permittee who violates any term of a permit.

102.  In its decisionmaking on RTH's revocable permit for [Lot 41] BLNR failed to begin with a presumption in favor of public use, access and enjoyment.

103.  In its decisionmaking on RTH's revocable permit for [Lot 41], BLNR failed to render any findings or provide any explanation as to why public recreational uses should be sacrificed for a restaurant, storage, and other commercial purposes.

104.  In its decisionmaking on RTH's revocable permit for [Lot 41], BLNR failed to make any findings or provide any explanation that justifies excluding members of the public from portions of the public trust beach.

105.  In its decisionmaking on RTH's revocable permit for [Lot 41], BLNR failed to exercise diligence.

106.  In its decisionmaking on RTH's revocable permit for [Lot 41], BLNR did not rely on an appraisal, or any methodology to establish the rental amount.

107.  In its decisionmaking on RTH's revocable permit for [Lot 41], BLNR failed to gather reliable information, or use any criteria, to determine an appropriate rental amount.

108.  In its decisionmaking on RTH's revocable permit for [Lot 41], BLNR ignored RTH's violations of the law and its permit conditions.

12

109. In its decisionmaking on RTH's revocable permit for [Lot 41], BLNR failed to exercise the authority vested in it by HRS §§ 171-7 and 171-6(14) and (15).

110. In its decisionmaking on RTH's revocable permit for [Lot 41], BLNR breached its trust duties.

111. BLNR's failure to fulfill their trust obligations harms Frankel's recreational, aesthetic, environmental and beneficial interests.

(Formatting altered.)

In his prayer for relief, Frankel requested, among other things, that the circuit court (1) invalidate the Board's November 2018 approval of the permit, (2) declare any permit issued pursuant to the November 2018 approval void *ab initio*, (3) enjoin DLNR and the Board from granting any permit for commercial use of Lot 41 "unless it fully complies with . . . its public trust duties," and (4) order the Board to adopt rules governing its decision making regarding revocable permits.

**(b)  Board's and Restorttrust's Motions for Summary Judgment**

The Board moved for summary judgment on all counts, stating it was entitled to judgment as a matter of law.

As to Count 4, the Board argued the public trust doctrine did not apply to Lot 41 because the Hawaiʻi Supreme Court "specifically declined to rule that other types of public land - such as the urban land at issue here - are covered" under the public trust doctrine.  The Board stated the circuit court "should rule on this case based on the present state of the

13

public trust doctrine which *does not* include state owned land in the urban district."

In the alternative, the Board argued it was still entitled to summary judgment because its "decision easily meets any reasonable standard for applying the public trust doctrine even if applicable here." The Board asserted it "could have - but did not - allow commercial use of Lot 41" and "could have - but did not - lease Lot 41 or otherwise afford exclusive rights to a private party." To support these assertions, the Board relied on the concept that a "central feature of the public trust doctrine is that the State has a duty both to protect natural resources *and* to promote their use and development."

Numerous exhibits were attached to the Board's motion.

Resorttrust also moved for summary judgment and joined the Board's motion.

### (c)  Frankel's Motion for Partial Summary Judgment

Frankel moved for summary judgment on Count 4, relying in part on article XII, section 4 (Ceded Lands Trust) and article XI, section 1 (Natural Resources Trust) of the Hawaiʻi Constitution and "the ancient public trust doctrine[.]"

Frankel argued the Board breached its duties by failing to:

(1) "take any enforcement action" regarding the commercial use of Lot 41 when the permit was granted for "recreational and maintenance purposes";

(2) "provide clarity in granting a new revocable permit[,]" relying on the explanation in In re Waiāhole Ditch Combined Contested Case Hearing (Waiāhole I), 94 Hawai'i 97, 9 P.3d 409 (2000) that "[c]larity in the agency's decision is all the more essential 'in a case such as this where the agency performs as a public trustee and is duty bound to demonstrate it has properly exercised the discretion vested in it by the constitution and the statute'";

(3) "act consistently with trust purposes" because "[t]here is no evidence that the BLNR Defendants began their decisionmaking with a presumption in favor of public use access and enjoyment" relying on Waiāhole I's explanation that any balancing begins with the presumption in favor of public use; and

(4) "consider alternatives," such as asking RTH to place the items on its own property.

(Formatting altered.)  See Waiāhole I, 94 Hawai'i at 142, 158, 9 P.3d at 454, 470.

Frankel further argued that, "[a]t a minimum, the [Board] should have prepared written findings to justify excluding members of the public from public trust ceded land dedicated to be used as a public beach. . . . They failed to do so."  Frankel attached numerous exhibits to his motion.

**The Board's Opposition.**  In its opposition to Frankel's motion for partial summary judgment, and similar to its motion for summary judgment, the Board argued Waiāhole I

"did not extend the scope of the trust doctrine beyond submerged land and water" and the Hawaiʻi Supreme Court "specifically declined to rule that other types of public land - such as the urban land at issue here - are covered."

**Resorttrust's Opposition.** Resorttrust also filed an opposition to Frankel's motion for partial summary judgment, arguing Frankel's claim failed as a matter of law because he "cannot demonstrate the State's public trust obligations apply to" Lot 41. (Formatting altered.) Resorttrust argued the public trust doctrine did not apply because Lot 41 is not a water resource or conservation land.

Resorttrust then argued that even if the public trust doctrine applied to Lot 41, the "evidence in the record, including [Frankel's] declarations, demonstrate that the public's interest and use in the remaining 52,520.3 [square feet] of the total 55,756.8 [square feet revocable permit] Premises is *not* substantially impaired." Resorttrust further argued "the conditions of the most recent [revocable permit] evidence [the Board's] careful consideration of public interests in the State Parcel and beach, and include measures to further protect those interests."

Finally, Resorttrust argued the Board properly considered alternatives and claimed Frankel "ignore[d] the

nearly five hours of testimony and questioning by [the Board] at the September 14, 2018 meeting, which was followed by over two hours of listening, questioning, and deliberating at the November 9, 2018 [Board] meeting."

Resorttrust attached numerous exhibits. One exhibit was the Revocable Permits Task Force Report dated June 24, 2016. This task force was convened "to revisit and evaluate the existing protocols and criteria for selecting a revocable permit or a lease for a disposition of use of State lands and to make recommendations for improvement." Among its goals was to "satisfy the fiduciary responsibility to the State of Hawaiʻi[,]" as the DLNR "has a responsibility to implement the public trust in managing State lands and as such, it is [DLNR's] duty to award and steward these lands accordingly." The task force's "priority was to be mindful of our obligations to the Public Trust and stewardship overseeing these public lands."

The task force submitted a "REVISED BOARD SUBMITTAL TEMPLATE" (**Revised Template**) to "[s]tandardize the Division['s] submittal template to the Board to include a checklist for revocable permits and supporting details for their review[.]" The Revised Template referenced HRS §§ 171-13 and -15, section 5 lands of the Hawaiʻi Admission Act, HRS Chapter 343, and HAR § 11-200-8. Nowhere does the Revised Template reference

17

article XI, section 1 (Natural Resources Trust) and article XII, section 4 (Ceded Lands Trust) of the Hawaiʻi Constitution or the public trust.

### (d) Circuit Court's Decisions

The circuit court denied Frankel's motion for parital summary judgment reasoning that the public trust doctrine did not apply to Lot 41 and even if it did, whether an agency violated the public trust doctrine was fact-based:

> IT IS HEREBY ORDERED that Plaintiff's Motion for Partial Summary Judgment as to Count 4, filed April 17, 2019, is DENIED on the following grounds:
>
> (1)   The public trust doctrine does not apply to [Lot 41], which is designated urban district land.  The Supreme Court of the State of Hawaiʻi has only applied the public trust doctrine to conservation district lands and use of water resources.
>
> (2)   In the alternative, even if the public trust doctrine applies to [Lot 41], Plaintiff's claim that an agency violated the public trust doctrine by approving the revocable permit at issue here, notwithstanding Plaintiff's opposition to that approval before the agency, requires an inherently fact-based balancing analysis of that agency's decision, which is not appropriate for determination on summary judgment.

The circuit court then granted the Board's and Resorttrust's motions for summary judgment referencing its denial of Frankel's motion for partial summary judgment stating it "has already ruled that the public trust doctrine does not apply to [Lot 41], which is designated urban district land.  The Supreme Court of Hawaiʻi has only applied the public trust

doctrine to conservation district lands and use of water resources."

Frankel filed a timely notice of appeal.

## II. STANDARDS OF REVIEW

We review the grant or denial of summary judgment de novo. Villaver v. Sylva, 145 Hawaiʻi 29, 34, 445 P.3d 701, 706 (2019). "When both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both sides' summary judgment evidence and determine all questions presented." Ke Kauhulu O Mānā v. Bd. of Land & Nat. Res., 154 Hawaiʻi 158, 547 P.3d 1188, No. CAAP-18-0000057, 2024 WL 1886115, at *7 (App. Apr. 30, 2024) (mem. op.) (citation omitted), cert. granted, No. SCWC-18-0000057, 2024 WL 3582474 (Haw. 2024).

"[W]hether or not an agency has followed proper procedures or considered the appropriate factors in making its determination is a question of law, and will be reviewed de novo." Sierra Club v. Dep't of Transp. (Superferry), 115 Hawaiʻi 299, 315, 167 P.3d 292, 308 (2007) (emphasis omitted).

Motions for reconsideration are reviewed for an abuse of discretion. Kaleikini v. Yoshioka, 128 Hawaiʻi 53, 68, 283 P.3d 60, 75 (2012).

**III. LEGAL LANDSCAPE**

**A.    The Public Trust Doctrine**

Historically, "the Hawaiian people maintained a communal stewardship over the land, ocean, and all of the natural resources of the islands."  MacKenzie, supra, at 6-7. Today, in this decision, we look to Hawaii's constitution (article XI, section 1 and article XII, section 4) and a seminal Hawaiʻi Supreme Court case (Waiāhole I) to understand the State's responsibility to ceded lands held in trust for the people of Hawaiʻi.

**1.    Hawaiʻi Constitution Article XI, Section 1 - Natural Resources Held in Public Trust**

Ratified in 1978, article XI, section 1 (Natural Resources Trust) of the Hawaiʻi Constitution enshrined the State's commitment to uphold the centuries-old public trust doctrine, particularly in light of the state's growing population and increased demand for our natural resources:

**ARTICLE XI**

. . . .

**CONSERVATION AND DEVELOPMENT OF RESOURCES**

**Section 1.**  For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.

> All public natural resources are <u>held in trust</u> by the State for the benefit of the people.

Haw. Const. art. XI, § 1 (underline added).

The standing committee report from the 1978 Constitutional Convention demonstrates the primacy of natural resource conservation over financial gain:

> In the present Constitution, the policy with regard to natural resources seems to be overly weighted by the emphasis on development and utilization. <u>Though the use of our natural resources is necessary it must be done in such a manner as to ensure the optimum long-term benefits for the inhabitants of our State</u>. The development and use of natural resources must be consistent with their conservation for future availability.
>
> When considering use and development of our natural resources, economic and social benefits are major concerns. However, the broad definition of economics, that of "careful and thrifty" use of the resources, <u>rather than in the narrow sense of immediate financial return</u>, should be adopted.

Comm. of the Whole Rep. No. 18, in 1 <u>Proceedings of the Constitutional Convention of Hawaii of 1978</u>, at 1025–26 (1980) (emphases added).

    2.    **Hawaiʻi Constitution Article XII, Section 4 - Ceded Lands Held in Public Trust**

Also ratified in 1978, article XII, section 4 (Ceded Lands Trust) directed the state to hold the ceded lands as a public trust for native Hawaiians and the general public:

**ARTICLE XII**

. . . .

**PUBLIC TRUST**

> **Section 4.** The lands granted to the State of Hawaii by Section 5(b) of the Admission Act and pursuant to Article XVI, Section 7, of the State Constitution,

21

> excluding therefrom lands defined as "available lands" by Section 203 of the Hawaiian Homes Commission Act, 1920, as amended, <u>shall be held by the State as a public trust for native Hawaiians and the general public</u>.

Haw. Const. art. XII, § 4 (underline added); <u>see</u> <u>Ching</u>, 145 Hawaiʻi at 176, 449 P.3d at 1174 (defining "'ceded land' [as] lands that were held by the civil government or the monarchy of the Hawaiian Kingdom at the time of the 1893 overthrow of the Hawaiian monarchy").

"Recognizing their special character, the Joint Resolution of Annexation exempted these lands from the general laws of the United States that governed federal land." <u>Ching</u>, 145 Hawaiʻi at 176, 449 P.3d at 1174. Instead, these lands were to "be held in a 'special trust' for the benefit of the people of Hawaiʻi" and later to be returned "subject to the trust provisions set forth in section 5(f) of the Admission Act." <u>Id.</u> Article XII, section 4 "formally recognize[s] these responsibilities, specifying that the land 'shall be held by the State as a public trust for native Hawaiians and the general public." <u>Id.</u> at 177, 449 P.3d at 1175.

The Hawaiʻi Supreme Court explained that "[t]he State's duty of care is especially <u>heightened</u> in the context of ceded land held in trust for the benefit of native Hawaiians and the general public under article XII, section 4." <u>Id.</u> at 177 n.49,

22

449 P.3d at 1175 n.49 (emphasis added).  The court also explained the unique connection Hawaiians have to the ʻāina.  Id.

### 3.  **Waiāhole I** (2000)

In Waiāhole I, decided twenty-five years ago, the Hawaiʻi Supreme Court surveyed and analyzed the public trust doctrine, and then applied that doctrine to the resource at issue - water.  94 Hawaiʻi at 131–33, 9 P.3d at 443–45.  The court explained "that article XI, section 1 [(Natural Resources Trust)] and article XI, section 7 [(Water Resources Trust)] adopt the public trust doctrine as a fundamental principle of constitutional law in Hawaiʻi."[9]  Id. at 132, 160, 9 P.3d at 444, 472 (footnote omitted).

---

[9]  Article XI, section 7 of the Hawaiʻi Constitution provides as follows:

**ARTICLE XI**

. . . .

**WATER RESOURCES**

**Section 7.**  The State has an obligation to protect, control and regulate the use of Hawaii's water resources for the benefit of its people.

The legislature shall provide for a water resources agency which, as provided by law, shall set overall water conservation, quality and use policies; define beneficial and reasonable uses; protect ground and surface water resources, watersheds and natural stream environments; establish criteria for water use priorities while assuring appurtenant rights and existing correlative and riparian uses and establish procedures for regulating all uses of Hawaii's water resources.

(Formatting altered.)

The supreme court then set forth basic principles to apply when contemplating whether to compromise a public trust resource, including (1) the burden of the permit applicant, (2) the duty of the permitting agency, and (3) the need for a decision that reflects a clear analysis, which is subsumed within the agency's duty.  Id. at 143, 160, 9 P.3d at 455, 472.

First, the applicant wanting to compromise the public trust resource has the burden of "justifying their proposed uses in light of protected public rights in the resource."  Id. at 142, 160, 9 P.3d at 454, 472.  This includes showing mitigating measures and the absence of practicable alternatives.  Id. at 143, 161, 9 P.3d at 455, 474.

Next, the agency tasked with protecting the trust resource "must not relegate itself to the role of a mere 'umpire passively calling balls and strikes for adversaries appearing before it,' but instead must take the initiative in considering, protecting, and advancing public rights in the resource at every stage of the planning and decisionmaking process."  Id. at 143, 9 P.3d at 455 (citations omitted).

Competing interests must be assessed on a case-by-case basis.  Id. at 142, 9 P.3d at 454.  "[A]ny balancing between public and private purposes begin[s] with a presumption in favor of public use, access, and enjoyment."  Id.  This is consistent

with the 1978 Constitutional Convention delegates' definition of "conservation," which is "the *protection, improvement and use* of natural resources according to principles that will assure their *highest economic or social benefits*." Id. at 139, 9 P.3d at 451 (quoting Stand. Comm. Rep. No. 77, in 1 Proceedings of the Constitutional Convention of Hawaii of 1978, at 685–86 (1980)) (internal quotation marks omitted). "In short, the object is not maximum consumptive use, but rather the most equitable, reasonable, and beneficial allocation of [trust] resources, with full recognition that resource protection also constitutes 'use.'" Id. at 140, 9 P.3d at 452 (emphasis added).

"Specifically, the public trust compels the state duly to consider the cumulative impact of existing and proposed diversions on trust purposes and to implement reasonable measures to mitigate this impact, including the use of alternative sources." Id. at 143, 9 P.3d at 455. "The trust also requires planning and decisionmaking from a global, long-term perspective." Id.

Increasingly important is our supreme court's recognition that, although the public trust doctrine is elastic and responsive to ever-shifting conditions, "the public trust has never been understood to safeguard rights of exclusive use for private commercial gain. Such an interpretation, indeed,

25

eviscerates the trust's basic purpose of reserving the resource for use and access by the general public without preference or restriction." Id. at 135, 138, 9 P.3d at 447, 450 ("The public trust, by its very nature, does not remain fixed for all time, but must conform to changing needs and circumstances."). "[I]f the public trust is to retain any meaning and effect, it must recognize enduring public rights in trust resources separate from, and superior to, the prevailing private interests in the resources at any given time." Id. at 138, 9 P.3d at 450.

It logically follows that a "'higher level of scrutiny' for private commercial uses" applies. Id. at 142, 9 P.3d at 454.

Finally, "where the record demonstrates considerable conflict or uncertainty in the evidence, the agency must articulate its factual analysis with reasonable clarity, giving some reason for discounting the evidence rejected." Id. at 163-64, 9 P.3d at 475-76. "In sum, the state may compromise public rights in the resource pursuant only to a decision made with a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state." Id. at 143, 9 P.3d at 455. The agency's "basis must be set forth with such clarity as to be understandable." Id. at

163, 9 P.3d at 475 (citations and internal quotation marks omitted).

**B.  Post Waiāhole I - Relevant Case Law**

In the twenty-five years since Waiāhole I, the Hawaiʻi Supreme Court has issued a number of opinions that guide our decision in this case.  In particular, we look (chronologically) at seven of these opinions to determine (1) whether the public trust applies to ceded lands; (2) whether questions of an agency following correct procedures or considering appropriate factors may be determined as a matter of law; (3) how an agency makes findings in its decision reflecting its public trust duty, or in the absence of findings, shows how it arrived at its decision; and (4) whether an agency may provide after-the-fact or extra-record evidence on review or remand to show its compliance with its public trust duties.

**1.  Superferry (2007)**

In Superferry, decided eighteen years ago, environmental groups sought a declaratory judgment that the State of Hawaiʻi Department of Transportation (**DOT**) and Superferry company were required to prepare an environmental assessment under HRS Chapter 343.  115 Hawaiʻi at 304, 312, 167 P.3d at 297, 305.  Although the Superferry decision did not involve the public trust doctrine, it looked at whether an

agency followed correct procedures and considered appropriate factors. Id. at 317, 167 P.3d at 310.

The Hawai'i Supreme Court explained "the dispute is whether DOT was correct to analyze only the harbor improvements in making its exemption determination, or was also required to consider the potential environmental impacts caused by the Hawaii Superferry project." Superferry, 115 Hawai'i at 336, 167 P.3d at 329. The court further explained the "applicable standard of review requires that this court determine, as a matter of law, whether or not DOT has followed the correct procedures and considered appropriate factors in making its determination that the harbor improvements made to Kahului harbor to facilitate the Superferry project should be exempted from the requirements of HRS chapter 343." Id. at 342, 167 P.3d at 335 (emphasis added).

The supreme court then determined "the record in this case shows that DOT did not consider whether its facilitation of the Hawaii Superferry Project will probably have minimal or no significant impacts, both primary and secondary, on the environment." Id. (emphasis added). It thus held, "based on this record, we can only conclude that DOT's determination that the improvements to Kahului Harbor are exempt from the

requirements of [the Hawaiʻi Environmental Policy Act (**HEPA**)] was erroneous as a matter of law." Id.

The supreme court, inter alia, instructed the circuit court to enter judgment in favor of the environmental groups on their claim as to the request for an environmental assessment. Id. at 343, 167 P.3d at 336.

The takeaway from Superferry, as relevant to this appeal, is that the appellate court determines as a matter of law whether an agency followed the correct procedures and considered the appropriate factors in its decisionmaking.

## 2. **Kauai Springs** (2014)

In Kauai Springs, Inc. v. Planning Commission of County of Kauaʻi, decided eleven years ago, a water bottling company sought permits to continue operating its bottling facility and a contested case hearing was held. 133 Hawaiʻi 141, 147, 324 P.3d 951, 957 (2014). Kauai Springs, like Waiāhole I, emphasized the agency's duty to make clear findings. Id. at 164, 324 P.3d at 974 (quoting Waiāhole I, 94 Hawaiʻi at 157, 9 P.3d at 469).

In Kauai Springs, the Hawaiʻi Supreme Court explained that

> [w]hen an agency or other deciding body considers an application for permits under circumstances that requires the deciding body to perform as a public trustee to protect a public trust resource, the agency or other deciding body must make findings sufficient to enable an appellate court

29

> to track the steps that the agency took in reaching its decision.

Id. at 173, 324 P.3d at 983 (emphases added).  "An agency is encouraged to be clear; 'clarity in the agency's decision is all the more essential . . . where the agency performs as a public trustee and is duty bound to demonstrate that it has properly exercised the discretion vested in it by the constitution and the statute.'"  Id. at 173-74, 324 P.3d at 983–84 (quoting Waiāhole I, 94 Hawaiʻi at 158, 9 P.3d at 470).

The supreme court emphasized that "[u]nder the foregoing principles and purposes of the public trust, it is manifest that a government body is precluded from allowing an applicant's proposed use to impact the public trust in the absence of an affirmative showing that the use does not conflict with those principles and purposes."  Id. at 174, 324 P.3d at 984 (emphasis added).  And, "a lack of information from the applicant is exactly the reason an agency is empowered to deny a proposed use of a public trust resource."  Id. (emphasis added).

The supreme court ultimately determined the Kauaʻi County Planning Commission's findings were not clearly erroneous and its conclusions were not wrong, thus, its denial of the permit was not arbitrary and capricious.  Id. at 181, 324 P.3d at 991.  Nevertheless, the court remanded the matter to the

Planning Commission to clarify its findings and conclusions as they "are essential when it performs as a public trustee." Id.

As relevant to this appeal, Kauai Springs repeated the need for the agency's decision to be clear so as to show it fulfilled its trust duties.

### 3. **Mauna Kea II** (2018)

In Matter of Conservation District Use Application HA-3568 (Mauna Kea II),[10] decided seven years ago, the plaintiffs appealed the BLNR's grant of the University of Hawaii's application for development of the Thirty Meter Telescope (**TMT**) following a contested case hearing. 143 Hawaiʻi 379, 384, 387, 431 P.3d 752, 757, 760 (2018). The issue before the Hawaiʻi Supreme Court was "whether the BLNR properly applied the law in analyzing whether a permit should be issued for the TMT." Id. at 384, 431 P.3d at 757.

In addressing the public trust doctrine, the supreme court stated it "has never precisely demarcated the dimensions of the public trust doctrine as incorporated in Article XI, Section 1" (Natural Resources Trust) and held that "conservation district lands owned by the State, such as the lands in the

---

[10] We refer to this opinion as Mauna Kea II because it is the follow-up to Mauna Kea Anaina Hou v. Board of Land & Natural Resources, 136 Hawaiʻi 376, 363 P.3d 224 (2015), commonly known as Mauna Kea I. Both cases concern the same application for a conservation district use permit submitted by the University of Hawaiʻi to construct the Thirty Meter Telescope atop Mauna Kea on Hawaiʻi Island.

summit area of Mauna Kea, are public resources held in trust for the benefit of the people pursuant to Article XI, Section 1." Id. at 400, 431 P.3d at 773 (footnote omitted).

Relying on Waiāhole I, the supreme court reaffirmed the requirements of article XI, section 1 such as the balancing between the conservation and protection of public natural resources and the development and utilization consistent with conservation. Id. at 400-01, 431 P.3d at 773–74. The court also reiterated that "any balancing between public and private purposes must begin with a presumption in favor of public use, access and enjoyment." Id. at 401, 431 P.3d at 774.

The supreme court then explained, "[i]n our de novo determination of whether these requirements of Article XI, Section 1 have been met, we consider relevant findings in the BLNR Decision and Order." Id. Ultimately, the court held that "TMT comport[ed] with Article XI, Section 1 public trust principles and that the BLNR met its duties as trustee under the Article XI, Section 1 public land trust through its Decision and Order." Id. at 402, 431 P.3d at 775 (footnote omitted).

In holding that the "conservation district lands owned by the State, such as the lands in the summit area of Mauna Kea, are public resources held in trust for the benefit of the people pursuant to Article XI, Section 1[,]" the supreme court noted in

footnote 23 that "[o]ther types of public lands (and whether or how public trust principles should apply to such lands) are not before us at this time."  Id. at 400, 400 n.23, 431 P.3d at 773, 773 n.23.

To that point, in footnote 24, the supreme court also noted the plaintiffs only asserted violation of article XI, section 1 (Natural Resources Trust) and did not assert a violation of the "ceded lands trust" pursuant to section 5(f) of the Admission Act or article XII, section 4 (Ceded Lands Trust) of the Hawaiʻi Constitution.  Id. at 401 n.24, 431 P.3d at 774 n.24.  The court explained that the ceded lands are subject to specific purposes established in section 5(f) and are also subject to article XII, section 4 (Ceded Lands Trust) and article XVI, section 7 (Compliance with Trust)[11] of the Hawaiʻi Constitution.  Id. ("Ceded lands are also subject to Article XII, Section 4 of the Hawaiʻi Constitution, which

_____

[11]  Article XVI, section 7 of the Hawaiʻi Constitution provides:

**ARTICLE XVI**

. . . .

**COMPLIANCE WITH TRUST**

**Section 7.**  Any trust provisions which Congress shall impose, upon the admission of this State, in respect of the lands patented to the State by the United States or the proceeds and income therefrom, shall be complied with by appropriate legislation.  Such legislation shall not diminish or limit the benefits of native Hawaiians under Section 4 of Article XII.

provides that '[t]he lands granted to the State of Hawaii by Section 5(b) of the Admission Act and pursuant to Article XVI, Section 7 . . . shall be held by the State as a public trust for native Hawaiians and the general public.'"). The court noted that these "constitutional provisions and effectuating legislation are not at issue in this case, but they may play a part in defining public trust principles under Article XI, Section 1 [(Natural Resources Trust)] with regard to conservation district lands owned by the State." Id. (emphasis added). The court then stated, "with respect to the Article XI, Section 1 public trust as to conservation lands, we do not wholesale adopt our precedent setting out public trust principles as applied to the state water resources trust" and "[r]ather the dimensions of this trust remain to be further demarcated." Id. (emphasis added).

As relevant to this appeal, Mauna Kea II shows us that beginning with a presumption in favor of public use, access, and enjoyment is a basic trust duty, and not a procedure limited to water resources. Also, Mauna Kea II recognized that ceded lands are subject to article XII, section 4 (Ceded Lands Trust) of the Hawaiʻi Constitution.

### 4.    Ching (2019)

In Ching, decided six years ago,[12] plaintiffs brought a declaratory action against DLNR and BLNR claiming, "the State, as trustee of the state's ceded lands, breached its trust duty 'to protect and maintain the public trust lands'" based on its failure to monitor the U.S. military's compliance with the lease of ceded lands in Hāmākua and North Kona for training purposes within the Pōhakuloa Training Area (**PTA**).[13]  145 Hawaiʻi at 152, 154, 160, 449 P.3d at 1150, 1152, 1158 (brackets omitted). Following a bench trial, the circuit court entered its findings, conclusions, and order in favor of the plaintiffs and against the State.  Id. at 160, 162, 164, 449 P.3d at 1158, 1160, 1162.

The circuit court found the State breached its trust duties by failing to (1) conduct reasonable inspections, (2) ensure the terms of the lease impacting the condition of the land or preserving cultural interests were followed, and (3) take prompt steps when made aware of possible lease violations.  Id. at 164, 449 P.3d at 1163.

---

[12]  Ching was decided seventeen days after the circuit court in this case denied Frankel's motion for partial summary judgment and three days after granting the State's motion for summary judgment, but fourteen days before Frankel's motion for reconsideration was filed.

[13]  Regarding the issue in Ching being a nonjusticiable political question, the supreme court explained that "[i]t is well settled that the determination of whether or not a particular proposed action, by the trustee of a charitable trust, would constitute a breach of that trust, is a matter to be determined by the courts, as part of their inherent jurisdiction."  145 Hawaiʻi at 175, 449 P.3d at 1173 (citations omitted).

On appeal, the State argued even if it had a public trust duty, the circuit court erred because, "it was <u>reasonable</u> for the State to delegate its duties and rely on its review of ancillary documents to monitor the PTA."  <u>Id.</u> at 179, 180, 449 P.3d at 1177, 1178 (emphasis added and footnote omitted).  "Typically, whether a fiduciary acted prudently -- or in other words, as a <u>reasonably prudent fiduciary -- is a question of fact</u>."  <u>Id.</u> at 179, 449 P.3d at 1177 (emphasis added, citation and internal quotation marks omitted); <u>Knodle v. Waikiki Gateway Hotel, Inc.</u>, 69 Haw. 376, 385, 742 P.2d 377, 383 (1987) ("Whether there was a breach of duty or not, i.e. whether there was a failure on the defendant's part to exercise <u>reasonable</u> care, is a question for the trier of fact.") (emphasis added).

The supreme court explained the "State's duties with respect to the leased PTA land are derived in part from the properties' status as 'ceded land' -- which are lands that were held by the civil government or the monarchy of the Hawaiian Kingdom at the time of the 1893 overthrow of the Hawaiian monarchy."  <u>Ching</u>, 145 Hawaiʻi at 176, 449 P.3d at 1174.  The State conceded that "our case law and common law of trusts make the State 'subject to certain general trust duties, such as a general duty to preserve trust property.'"  <u>Id.</u> at 177, 449 P.3d at 1175.

36

The supreme court held that delegating the State's duties was inherently invalid under the Hawaiʻi Constitution and our common law of trusts. Id. at 180-81, 449 P.3d at 1178-79. And even if it were permissible, the "delegation would itself have to be reasonable under the prudent person standard, and the State would maintain a trust duty to reasonably supervise the agent in its performance of the monitoring." Id. at 181, 449 P.3d at 1179 (emphases added). Ultimately, the court held that the circuit court did not err in its findings. Id. at 182, 449 P.3d at 1180.

As relevant to this appeal, the supreme court again recognized that ceded lands are held in trust and the State has a duty to preserve that trust resource. And whether the State acted as a reasonably prudent fiduciary in preserving that trust resource is a question of fact.

5.    **In re MECO** (2022)

In Matter of Maui Electric Co. (In re MECO), decided three years ago, appellants asked the Hawaiʻi Supreme Court to vacate the Public Utilities Commission (**PUC**)'s approval of a power purchase agreement contending, in part, "that the PUC failed to fulfill its public trust duties." 150 Hawaiʻi 528, 531, 532, 506 P.3d 192, 195, 196 (2022). Specifically, appellants maintained "the PUC should have made explicit

findings identifying the affected trust resources and assessing how they would be protected." Id. at 536, 506 P.3d at 200.

The supreme court held that "the statutes governing the PUC's [power purchase agreement] review - HRS §§ 269-6(b) and 269-145.5(b) - reflect the core public trust principles: the State and its agencies must *protect* and promote the *justified use* of Hawaiʻi's natural beauty and natural resources." Id. at 532, 506 P.3d at 196. "Thus, when there is no reasonable threat to a trust resource, satisfying those statutory provisions fulfills the PUC's obligations as trustee." Id. "But when a project poses a reasonable threat, the public trust principles require more from the PUC: the commission must assess that threat and make specific findings about the affected trust resource." Id.

The supreme court held "the 'public interest'-minded balancing requirement under HRS §§ 269-6(b) and 269-145.5(b) aligns with the core public trust principles weighing protection and utilization." Id. at 538, 506 P.3d at 202. The "PUC considered [the selected company's] efforts to explore an alternative site[,]" among other factors and found that relocation "was not feasible due to archaeological, cultural, and topographical concerns." Id. at 540, 506 P.3d at 204.

"The PUC did not make explicit findings about its public trust duties in the Approval Order.  But its Recon Order concluded that it had fulfilled its public trust duties by satisfying its obligations under HRS §§ 269-6(b) and 269-145.5(b)."  Id.

The supreme court affirmed the PUC's approval of the power purchase agreement.  Id. at 541, 506 P.3d at 205.

As relevant to this appeal, In re MECO shows us that an agency's failure to make findings regarding its public trust duties is not always fatal.  In the absence of explicit findings regarding its public trust duties, an agency's decision may nonetheless be upheld if there was no reasonable threat to the trust resource or the public record shows it fulfilled its public trust duty.

### 6.  **Carmichael** (2022)

In Carmichael v. Board of Land and Natural Resources, decided three years ago, plaintiffs brought a declaratory action against DLNR and BLNR among others claiming violation of HRS Chapter 343 where, like this case, "revocable permits were annually 'continued' by a process in which the BLNR reviewed and voted to approve for continuation a 'master listing' of hundreds of revocable permits submitted by DLNR."  150 Hawaiʻi 547, 555-56, 506 P.3d 211, 219-20 (2022).  The temporary permits at issue

in Carmichael were renewed for ten years.  Id. at 555, 506 P.3d at 219.

On appeal to the ICA, this court determined that "there were genuine issues of material fact as to whether the BLNR's continuance decision (1) was temporary or de facto indefinite, and (2) served the best interests of the State, such that it was inappropriate to dispose of this case at the summary judgment stage."  Id. at 562, 506 P.3d at 226 (cleaned up).

However, the supreme court held the ICA "erred by ruling on the basis of perceived issues of material fact."  Id. The supreme court explained, "HRS § 171-55 did not authorize the BLNR's 2014 continuation decision because the BLNR did not make factual findings or enter conclusions of law positing that it was serving the State's best interests" and "[a]s a trustee of the public trust, the BLNR failed to demonstrate that it properly exercised the discretion vested in it by the constitution and the statute."  Id.; see HRS § 171-55 (2011) ("[T]he [BLNR] may issue permits for the temporary occupancy of state lands . . . on a month-to-month basis . . . under conditions and rent which will serve the best interests of the State[.]") (emphasis added).

The supreme court reiterated the fundamental principle that the public trust "requires that state agencies 'must take

40

the initiative in considering, protecting, and advancing public rights in the resource at every stage of the planning and decision-making process.'" Id. at 566, 506 P.3d at 230 (citation omitted). "In particular, where an agency performs as a trustee, it is 'duty bound to demonstrate that it has properly exercised the discretion vested in it by the constitution and the statute.'" Id. (citations omitted).

The supreme court determined the permit continuation "was not authorized by HRS § 171-55 because the BLNR did not make any findings of fact or conclusions of law." Id. The court noted that "the BLNR's failure to make findings here was particularly troubling in light of the magnitude of the water diversions authorized and the BLNR's role as a public trustee of the State's water resources." Id. at 567, 506 P.3d at 231. The court explained that while it does "not fully set out the scope of BLNR's duty to make the requisite findings, we note that the duty may vary in conjunction with the resources implicated" and "[a]t minimum, the BLNR must make findings 'sufficient to enable an appellate court to track the steps that the agency took in reaching its decision.'" Id. (emphases added) (citing Kauai Springs, 133 Hawaiʻi at 173, 324 P.3d at 983).

The supreme court affirmed the circuit court's order granting the plaintiffs' motion for summary judgment as to its

conclusion that the revocable permits were not authorized under HRS § 171-55.  150 Hawaiʻi at 572, 506 P.3d at 236.

As relevant to this appeal, the supreme court again emphasized the need for an agency's decision to be clear.  Where the agency failed to make findings regarding a factor it was required to consider - serving the best interest of the State - the agency failed to demonstrate it properly exercised its discretion.

### 7.  <u>Kiaʻi Wai</u> (2022)

Finally, in <u>Kiaʻi Wai v. Department of Water</u>, also decided three years ago, the Kauaʻi Department of Water (**KDOW**) proposed to install a water transmission line and obtained a finding of no significant impact.  151 Hawaiʻi 442, 447, 517 P.3d 725, 730 (2022).  Kiaʻi Wai filed a complaint contending, inter alia, that KDOW violated its trust obligations.  <u>Id.</u> at 452, 517 P.3d at 735.  KDOW moved for, and the circuit court granted, summary judgment.  <u>Id.</u> at 453, 517 P.3d at 736.

Although the supreme court did not reach the public trust issue, the court explained that "<u>whether or not an agency has followed proper procedures or considered the appropriate factors in making its determination is a question of law, and will be reviewed de novo.</u>"  <u>Id.</u> at 454, 517 P.3d at 737 (emphasis added and citation omitted).  The supreme court

further explained that appellate courts "must take a close look at agency decisions that involve the public trust" and "agency decisions affecting public trust resources carry a presumption of validity."  Id. at 454-55, 517 P.3d at 737-38 (cleaned up).

The supreme court held KDOW "failed to properly consider increased water withdrawals as a secondary impact" because the finding that water withdrawals will not increase was clearly erroneous and the department "misapplied HEPA by limiting its review to the physical footprint of the project and failing to consider secondary impacts beyond the project site." Id. at 455, 517 P.3d at 738.

The supreme court explained, that based on the record before it, "there can be no dispute that KDOW failed to take the required 'hard look' at the possibility of increased water usage."  Id. at 460, 517 P.3d at 743.  "If KDOW can demonstrate the relief line will likely not increase water withdrawals, it must do so in a revised [environmental assessment].  That is, KDOW cannot merely present additional evidence to the environmental court on remand."  Id.

The supreme court further explained that "while plaintiffs may present extra-record evidence to identify issues with the environmental review process, an agency cannot rely on extra-record evidence as a substitute for analysis the agency

should have included in an environmental review document." Id.

(some emphasis added).

> If the agency knew that it could always 'supplement' or 'create' the administrative record in the reviewing court, then the agency would have little incentive to prepare an adequate and reviewable administrative record, despite the clear mandate of [the National Environmental Policy Act (**NEPA**)] and HEPA that the agency prepare the required record before deciding upon a particular course of conduct.
>
> . . . .
>
> Additionally, it would frustrate public participation in the HEPA process if agencies could remedy deficient HEPA analysis with evidence submitted to a court after-the-fact. . . . While it may sometimes be appropriate for agencies to submit extra-record evidence -- for example, to provide context, explain their procedures, or rebut the plaintiffs' evidence -- courts must not allow that evidence to pass as explanations or justifications that should have been in the environmental review documents in the first place.

Id. at 460-61, 517 P.3d at 743-44 (cleaned up). "Further, HEPA, like NEPA, 'expressly places the burden of compiling information on the agency so that the public and interested government departments can conveniently monitor and criticize the agency's action.'" Id. at 461, 517 P.3d at 744 (citation omitted).

The supreme court vacated the circuit court's judgment and remanded the case for further proceedings consistent with its opinion. Id. at 467, 517 P.3d at 750.

As relevant to this appeal, the supreme court again explained that whether an agency followed correct procedures or considered appropriate factors in making its decision are questions of law. Of particular note, the supreme court restricted what an agency may present when its decision is on

review, and warned that extra-record evidence cannot be used to explain what should have been included in the agency's decision.

8.   **Summary**

In surveying these supreme court opinions, we glean the following:

First, the Hawaiʻi Supreme Court clarified that the public trust doctrine applies to ceded lands.  Ching, 145 Hawaiʻi at 176-77, 449 P.3d at 1174-75.

Second, whether an agency followed the correct procedure or considered the appropriate factors are legal questions that may be determined as a matter of law. Superferry, 115 Hawaiʻi at 317, 167 P.3d at 310; Kiaʻi Wai, 151 Hawaiʻi at 454, 517 P.3d at 737.  This is different from determining whether the agency failed to exercise reasonable care in executing its trust duties, which is a factual question as it generally requires the weighing of evidence and determining the credibility of witnesses.  See Ching, 145 Hawaiʻi at 152, 179, 180, 449 P.3d at 1150, 1777, 1178.

Weighing of evidence and determining the credibility of witnesses are not part of the appellate review to determine whether the agency followed correct procedures or considered appropriate factors.  See id. at 152, 179, 180, 449 P.3d at 1150, 1777, 1178; Superferry, 115 Hawaiʻi at 317, 167 P.3d at

310; Kiaʻi Wai, 151 Hawaiʻi at 454, 517 P.3d at 737.  Whether correct procedures were followed and appropriate factors were considered should be evident from the agency decision itself or in the record available to the public.  See Superferry, 115 Hawaiʻi at 342, 167 P.3d at 335; Kiaʻi Wai, 151 Hawaiʻi at 460-61, 517 P.3d at 744-45 ("[I]f the agency knew that it could always 'supplement' or 'create' the administrative record in the reviewing court, then the agency would have little incentive to prepare an adequate and reviewable administrative record[.]") (cleaned up).

The supreme court in Superferry and Kiaʻi Wai considered the agency's duty in the context of the agency's compliance with its statutory mandate under HEPA.  Superferry, 115 Hawaiʻi at 317, 167 P.3d at 310; Kiaʻi Wai, 151 Hawaiʻi at 460, 517 P.3d at 743.  Our consideration of whether an agency followed the correct procedure or considered appropriate factors is no different here, where the agency's duty is set forth in common law.  See generally Waiāhole I, 94 Hawaiʻi at 130-31, 9 P.3d at 442-43.

Third, the Hawaiʻi Supreme Court has been consistent in its mandate from Waiāhole I that an agency make clear findings. Kauai Springs, 133 Hawaiʻi at 164, 324 P.3d at 974; see Carmichael, 150 Hawaiʻi at 567, 506 P.3d at 231.  Where an

agency's findings reflect that trust resources were protected and not compromised, the agency's decision may be upheld. See generally In re MECO, 150 Hawaiʻi at 532, 540, 506 P.3d at 196, 204. But where an agency's decision fails to "articulate its factual analysis with reasonable clarity" when compromising a public trust resource, the agency's decision may be vacated. Waiāhole I, 94 Hawaiʻi at 163-64, 9 P.3d at 475-76.

Finally, an agency does not get a do-over of its decision-making process on appellate review or in a declaratory action. See Kiaʻi Wai, 151 Hawaiʻi at 460, 517 P.3d at 743 (explaining that "an agency cannot rely on extra-record evidence as a substitute for analysis the agency should have included" in its decision or on the record). While the court's review in Kiaʻi Wai was in the context of the agency's statutory HEPA mandate, we see no reason why the court's reasoning - that "[i]f the agency knew that it could always 'supplement' or 'create' the administrative record in the reviewing court, then the agency would have little incentive to prepare an adequate and reviewable administrative record" - should not similarly apply to the agency decision here. Id. (citation and internal quotation marks omitted).

We address Frankel's appeal in light of the above principles from these Hawaiʻi Supreme Court opinions.

47

## IV.  DISCUSSION

As stated earlier, the circuit court granted the Board's and Resorttrust's motions for summary judgment, ruling the public trust doctrine did not apply to Lot 41 because it was zoned urban.  The circuit court denied Frankel's motion for partial summary judgment for the same reason, and added that even if the public trust doctrine applied to Lot 41, whether the agency violated the public trust doctrine "requires an inherently fact-based balancing analysis" not appropriate for summary judgment.

On appeal, Frankel raises five points of error (**POE**), contending the circuit court erred when it:

(1)   "held that trust principles do not apply to Lot 41";

(2)   "held that a court cannot conclude that a breach of trust occurred in the context of a summary judgment motion even when no facts are in dispute";

(3)   "denied [his] motion for partial summary judgment as to Count 4";

(4)   "granted summary judgment to all the defendants as to Count 4"; and

(5)   "denied [his] motion for reconsideration of the three orders relating to count 4" that he brought pursuant to Ching.

As explained below, we hold that the circuit court erred because public trust principles applied to Lot 41, Frankel

48

met his summary judgment burden, and the Board and Resorttrust did not meet their summary judgment burden.

## A. Public Trust Principles Apply to Lot 41 (POE 1 & 5)

On appeal, Frankel contends the circuit court erred in determining that public trust principles did not apply to Lot 41.  To support his contention, Frankel relies in part on article XII, section 4 (Ceded Lands Trust) and article XI, section 1 (Natural Resources Trust) of the Hawaiʻi Constitution.

It is undisputed that Lot 41 is part of the "[s]ection 5(b) lands of the Hawaii Admission Act" and, thus, is ceded land.  The Admission Act mandated these lands be held in public trust.  The Admission Act, 1959, Pub. L. No. 86-3, § 5(f), 73 Stat. 4, reprinted in 1 HRS at 136–37 (2009).

Since 1978, the ceded lands were expressly held in public trust under article XII, section 4 (Ceded Lands Trust) of the Hawaiʻi Constitution.  The burdens and duties of article XII, section 4's public trust mandate, like that of article XI, section 1 (Natural Resources Trust), are guided by the principles set forth in Waiāhole I.  94 Hawaiʻi at 131–32, 9 P.3d at 443–44.  Again, these principles instruct as to (1) the burden of the applicant requesting to compromise a trust resource, (2) the duty of the agency entrusted with protecting the trust resource, and (3) the need for decisions to reflect

clear analysis, which is subsumed within the agency's duty.  Id. at 143, 160, 163-64, 9 P.3d at 455, 472, 475-76.

In addition, the applicant's burden and agency's duty set forth in Waiāhole I are *heightened* due to the special character of, and the complicated history surrounding, ceded lands.  See Ching, 145 Hawaiʻi at 177 n.49, 449 P.3d at 1175 n.49 ("The State's duty of care is especially heightened in the context of ceded land held in trust for the benefit of native Hawaiians and the general public under article XII, section 4.").

Finally, the applicant's burden and agency's duty are subject to a *higher* level of scrutiny in this case because the proposed use is a private commercial use.  Waiāhole I, 94 Hawaiʻi at 142, 9 P.3d at 454.

As set forth in article XII, section 4 (Ceded Lands Trust) of the Hawaiʻi Constitution and Ching, the public trust applies to ceded lands and, thus, applies to Lot 41.  We therefore hold the circuit court was wrong in concluding public trust principles did not apply to Lot 41.

**B.   Frankel's Motion for Partial Summary Judgment (POE 2 & 3)**

The circuit court erred in denying Frankel's motion for partial summary judgment because the evidence, even when viewed in the light most favorable to the Board and Resorttrust,

did not show that the Board (1) began with the presumption in favor of public use, (2) considered alternatives, or (3) provided a clear analysis when it issued a permit that compromised a public trust resource.

### 1. Summary Judgment Burden

The burden is on the party moving for summary judgment "to show the absence of any genuine issue as to all material facts, which, under applicable principles of substantive law, entitles the moving party to judgment as a matter of law." Umberger v. Dep't of Land & Nat. Res., 140 Hawaiʻi 500, 528, 403 P.3d 277, 305 (2017) (cleaned up). The movant must satisfy two components in order to meet its burden. Ralston v. Yim, 129 Hawaiʻi 46, 56, 292 P.3d 1276, 1286 (2013).

The movant has the burden of production - to show there is not a genuine issue of material fact as to the essential elements of the claim and that it is entitled to a judgment as a matter of law. Id. The movant also bears the burden of persuasion - to convince the court that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Id. at 57, 292 P.3d at 1287.

If the plaintiff, who has the burden of proof at trial, is the movant, "the plaintiff must establish, as a matter of law, each element of its claim for relief by the proper

evidentiary standard applicable to that claim." Ocwen Fed. Bank, FSB v. Russell, 99 Hawaiʻi 173, 182-83, 53 P.3d 312, 321-22 (2002).

If the plaintiff as the movant satisfies this burden, the burden then shifts to the nonmoving party defendant to "demonstrate the existence of a triable, material factual issue on the plaintiff's claims" or adduce "evidence of material facts which demonstrate the existence of affirmative defenses that would defeat the plaintiff's claim." Id. at 183, 53 P.3d at 322.

2.  **Procedural Requirements for an Agency Determining Whether to Compromise a Public Trust Resource**

In his summary judgment motion, Frankel asserted four bases for the Board's breach of its public trust duties: (1) failure to enforce the permit conditions in the past; (2) failure to start with the presumption in favor of public use; (3) failure to consider alternatives; and (4) failure to provide clarity in its decision. The first basis is a substantive challenge,[14] while the other three are procedural. We address the three procedural challenges, and do not reach the substantive challenge.

---

[14]  Asserting a substantive breach of an agency's public trust duty is a fact-based dispute that requires application of the standard set forth in Ching. The circuit court here, in its alternate ruling, characterized Frankel's breach of trust challenge as a substantive challenge requiring resolution of disputed material facts.

When compromising a public trust resource, Hawaiʻi law requires the agency entrusted to protect that trust resource to (1) begin its analysis with the presumption in favor of public use when balancing between public and private purposes, (2) consider practicable alternatives, and (3) set forth its decision with clarity. Waiāhole I, 94 Hawaiʻi at 142, 143, 158, 171, 9 P.3d at 454, 455, 470, 483.

Whether an agency has considered the appropriate factors or followed the proper procedures are questions of law. Superferry, 115 Hawaiʻi at 315, 167 P.3d at 308; Kiaʻi Wai, 151 Hawaiʻi at 454, 517 P.3d at 737. As a question of law, the agency's decision is not entitled to deference. See Kaleikini, 128 Hawaiʻi at 79, 283 P.3d at 86 (explaining that "whether or not an agency has followed proper procedures . . . in making its determination is a question of law and will be reviewed *de novo*" and, thus, "the agency is not entitled to deference" (citation and internal quotation marks omitted)); Hoʻomoana Found. v. Land Use Comm'n, 152 Hawaiʻi 337, 343, 526 P.3d 314, 320 (2023) (explaining that "questions regarding procedural defects are reviewable under [HRS § 91-14(g)](3)" where the agency decision was "[m]ade upon unlawful procedure" (citations omitted)); In re Robert's Tours & Transp., Inc., 104 Hawaiʻi 98, 102, 85 P.3d 623, 627 (2004) (explaining that under HRS § 91-14(g) "we see no

reason why the standards of review for an agency decision should differ depending on whether the appeal arises from a contested or noncontested case").

Here, the Board did not make explicit findings showing it fulfilled these three procedural requirements in executing its public trust duties.  Pursuant to In re MECO, even in the absence of explicit public trust findings in the agency's decision, the decision may nonetheless be upheld if the public record reflects an application of the public trust principles. 150 Hawai'i at 540, 506 P.3d at 204.

Applied here, if the evidence before the circuit court did not show in publicly available information that the Board considered alternatives, Frankel was entitled to judgment as a matter of law because the Board failed to consider the appropriate factors in compromising the public trust resource. See id.; Superferry, 115 Hawai'i at 315, 167 P.3d at 308; Kia'i Wai, 151 Hawai'i at 454, 517 P.3d at 737.  And if the evidence before the circuit court did not show in publicly available information that the Board began with the presumption in favor of public use or articulated its decision to compromise the public trust resource with clarity, Frankel was also entitled to judgment as a matter of law because the Board failed to follow the proper procedure.  See In re MECO, 150 Hawai'i at 540, 506

P.3d at 204; Waiāhole I, 94 Hawaiʻi at 142, 158, 167 P.3d at 454, 470; Kiaʻi Wai, 151 Hawaiʻi at 454, 517 P.3d at 737.

### 3.    Frankel Met His Burden

The circuit court record contained the following pertinent evidence: (1) the June 2018 letter from Sierra Club and July 2018 letter from Hawaii's Thousand Friends; (2) the September 2018 and November 2018 testimonies from Frankel;[15] (3) the September 2018 staff submittal and meeting minutes; (4) the November 2018 staff submittal and meeting minutes; and (5) the January 29, 2019 Permit.

The letters from Sierra Club and Hawaii's Thousand Friends, as well as Frankel's testimonies,[16] placed the issue of the Board's public trust duties squarely before the Board.  But the September 2018 staff submittal and minutes, the November 2018 staff submittal and minutes, and the January 29, 2019 permit did not show that the Board, in compromising a public trust resource, (1) started with the presumption in favor of public use, (2) considered alternatives, and (3) provided clarity in its decision.

---

[15] See Agenda Item D-17: Annual Renewal of Revocable Permits on the Island of Oahu, Meeting Before the Board of Land and Natural Resources, at 37–38 (written testimony of David Kimo Frankel) for Frankel's November 2018 testimony.

[16] See id.

The Board's September 2018 staff submittal identified Lot 41 as part of "Section 5(b) lands of the Hawaii Admission Act," or ceded lands. The submittal did not reference the Board's constitutional and public trust duties regarding ceded lands, however.

There was nothing in the September 2018 staff submittal to show that the Board began with the presumption in favor of public use. The September 2018 staff submittal did not mention article XI, section 1 (Natural Resources Trust) and article XII, section 4 (Ceded Lands Trust) of the Hawaiʻi Constitution or the public trust; the only legal references in the document were HRS § 171-55, HAR § 11-200-8, HAR Chapter 11-200, and HRS Chapter 343.

The justification for the permit was to "regulate the hotel's improvements and activities at the subject location," noting the property's unsuitability for public auction lease, and the hotel's withdrawal of its draft environmental assessment. There was no mention of the presumption in favor of public use or consideration of alternate sites.

The September 2018 staff submittal explained public access was always required and there were prior incidents where access was denied. The submittal also explained Resorttrust made a "promise" to comply with the requirement of public

access.[17]  This analysis does not establish that the Board, in determining whether to compromise public use of Lot 41, began with the presumption in favor of public use.

Like the September 2018 staff submittal, the September 2018 meeting minutes, the November 2018 staff submittal, the November 2018 meeting minutes, and the January 29, 2019 permit do not reflect that the Board, in compromising a public trust resource, (1) started with the presumption in favor of public use, (2) considered alternatives, and (3) provided clarity in its decision.

Thus, Frankel met his burden of showing the Board did not consider the appropriate factors and did not follow the correct procedures in rendering its decision to compromise a public trust resource.

### 4.    The Board and Resorttrust Did Not Meet Their Burden

The burden then shifted to the Board and Resorttrust to show there were genuine issues of material fact as to whether, or present evidence of where, the Board followed the procedural requirements for agency public trust decisionmaking

---

[17]  The Board considering Resorttrust's promise of public access is not the same as starting its analysis with the presumption in favor of public use when determining whether to compromise a public trust resource for private commercial use.  But, assuming arguendo that, when viewed in the light most favorable to the State and Resorttrust, the promise of public access would constitute sufficient evidence to survive summary judgment, the Board did not meet the other procedural requirements of considering alternatives and providing clarity in its decision.

relevant here by (1) starting with the presumption in favor of public use, (2) considering alternatives, and (3) providing clarity in its decision.  See Ocwen, 99 Hawaiʻi at 183, 53 P.3d at 322.  The Board and Resorttrust did not meet their burden.

The Board argued the public trust doctrine did not extend to urban-zoned land.  In the alternative, the Board asserted it was entitled to summary judgment because it easily met the standards "for applying the public trust doctrine." Specifically, the Board stated it "could have - but did not - allow commercial use of Lot 41" and "could have - but did not - lease Lot 41 or otherwise afford exclusive rights to a private party."  These statements appear to imply that the public is fortunate the Board did not compromise the public resource even more than it did.  But these statements do not demonstrate the Board began with the presumption in favor of public use or considered alternatives.

Nowhere in its memorandum in opposition did the Board cite to where in the record it started with the presumption in favor of public use or where it considered alternate sites upon which Resorttrust could place the items it wanted to place on ceded land.  See generally Int'l Bhd. of Elec. Workers, Loc. 1357 v. Hawaiian Tel. Co., 68 Haw. 316, 332, 13 P.2d 943, 956 (1986) (emphasizing "again that an appellate court is not

required to sift through a voluminous record for documentation of a party's contention") (footnote omitted).

In its memorandum in opposition to Frankel's summary judgment motion, Resorttrust similarly argued Frankel's claim failed as a matter of law because he "cannot demonstrate the State's public trust obligations apply to" Lot 41. (Formatting altered.) In the alternative, Resorttrust maintained the permit does not substantially impair Lot 41 and the conditions imposed upon it shows the Board considered public interests. Finally, Resorttrust argued Frankel ignored the hours of testimony presented at the September and November 2018 meetings.

Resorttrust, however, did not identify where in the record (or where in the hours of hearing testimony) the Board started with the presumption in favor of public use or considered alternatives.

Resorttrust also did not identify where in the record it met its burden of providing the Board with information for consideration of alternate sites for the items it sought to place on ceded land. This alone was a basis to deny Resorttrust's application. See generally Kauai Springs, 133 Hawai'i at 174, 324 P.3d at 984 (explaining that "a lack of information from the applicant is exactly the reason an agency

is empowered to deny a proposed use of a public trust resource").

Notably, Resorttrust attached a 2016 "Report and Recommendations from the [DLNR] Revocable Permits Task Force" as an exhibit. The task force stated its "priority was to be mindful of our obligations to the Public Trust and stewardship overseeing these public lands." The attached Revised Template resembled the format used in the September 2018 staff submittal. The Revised Template, however, did not mention the public trust or provide direction for the staff to incorporate the agency's public trust duties in their submittals and recommendations to the Board.

### 5. Conclusion

In conclusion, even when viewing the evidence in the light most favorable to the Board and Resorttrust, the record does not establish that the Board complied with the three procedural requirements for agency public trust decisionmaking relevant here - (1) starting with the presumption in favor of public use, (2) considering alternatives, and (3) providing clarity in its decision. Thus, the Board's decision compromised a public trust resource, ceded lands, without the required "level of openness, diligence, and foresight" our state law requires. See Waiāhole I, 94 Hawai'i at 143, 9 P.3d at 455.

Frankel was therefore entitled to judgment as a matter of law on the procedural breach of trust challenges in his motion for partial summary judgment, and his substantive breach of trust challenge (which would require a reasonableness determination and is a question of fact) need not be addressed. Thus, the circuit court erred in denying Frankel's motion for partial summary judgment and abused its discretion in denying Frankel's motion for reconsideration brought pursuant to Ching.

## C. Board's and Resorttrust's Motions for Summary Judgment (POE 4)

The circuit court granted the Board's and Resorttrust's motions for summary judgment referencing its denial of Frankel's motion for partial summary judgment and stating it "has already ruled that the public trust doctrine does not apply to [Lot 41], which is designated urban district land. The Supreme Court of the State of Hawaiʻi has only applied the public trust doctrine to conservation district lands and use of water resources." However, the Board and Resorttrust did not demonstrate that Frankel could not carry his burden of proof at trial.

### 1. Summary Judgment Burden

A defendant movant "may satisfy [its] initial burden of production by either (1) presenting evidence negating an element of the non-movant's claim, or (2) demonstrating that the

[non-movant] will be unable to carry his or her burden of proof at trial." Ralston, 129 Hawaiʻi at 60, 292 P.3d at 1290. "Where the movant attempts to meet his or her burden through the latter means, he or she must show not only that the non-movant has not placed proof in the record, but also that the movant will be unable to offer proof at trial." Id. at 60-61, 292 P.3d at 1290-91 (emphasis omitted).

## 2.   The Board Did Not Meet Its Burden

In Count 4 of his complaint, Frankel made numerous allegations (numbers 99-111) to support his claim that the Board breached its public trust duties, some procedural and some substantive. If Frankel could prove any one of his allegations, he would establish breach of the public trust.

To show it was entitled to summary judgment on Count 4 as a matter of law, the Board argued that the public trust did not apply to urban-zoned land. If true, the inapplicability of the public trust to Lot 41 would have defeated Frankel's breach of public trust claim. However, contrary to the Board's argument, the public trust applies to ceded lands and, thus, applies to Lot 41. And none of the Board's other arguments showed Frankel could not meet his burden at trial as to each allegation supporting his breach claim in Count 4.

### 3. Resorttrust Did Not Meet Its Burden

In its motion for summary judgment, Resorttrust stated Frankel "attacks" the permit, "trying to impose his desire for a less crowded beach" and "to change more than 50 years of the status quo and BLNR's long history of issuing [revocable permits] for use of the State Parcel by the Hotel and its guests, along with the general public."  Resorttrust then argued Frankel's "claim fails as a matter of law, because (1) [he] cannot demonstrate the State's public trust obligations apply to the State parcel, and (2) the Board properly discharged its obligations."  (Formatting altered.)

Like the Board, Resorttrust argued "aside from water and Conservation District lands, the Court has not explicitly ruled that public trust obligations must be fulfilled for other types of lands, such as the State Parcel, which is designated in the Urban District."  Resorttrust also asserted the revocable permit "clearly protects, and indeed facilitates, public use of the State Parcel while balancing that with RTH's rights to use the State Parcel for certain enumerated activities."  Resorttrust maintained "BLNR has exercised diligence and a high standard of care to protect the State Parcel over the decades" and "the conditions of the most recent [revocable permit] evidence the BLNR's careful consideration of public interests in

the State Parcel and beach, and include measures to further protect those interests."

As discussed above, the public trust doctrine applies to Lot 41. As for Resorttrust's secondary argument that the Board met its obligations, none of its assertions showed Frankel could not meet his burden at trial as to each allegation underlying his breach claim such that Resorttrust was entitled to a judgment as a matter of law.

### 4. Conclusion

Viewing the evidence in the light most favorable to Frankel, the Board and Resorttrust did not meet their burden of showing they were entitled to judgment as a matter of law on each allegation supporting Frankel's breach claim. As the Board and Resorttrust failed to meet their burden, the burden did not shift to Frankel.

Because the Board and Resorttrust failed to show they were entitled to judgment as a matter of law, the circuit court erred in granting summary judgment in favor of the Board and Resorttrust.

### V. CONCLUSION

Based on the foregoing, we vacate the circuit court's August 6, 2019 order denying Frankel's motion for partial summary judgment and August 20, 2019 orders granting the Board's

and Resorttrust's motions for summary judgment.  We remand this case to the circuit court for further proceedings consistent with this opinion.


On the briefs:                          /s/ Karen T. Nakasone
                                        Associate Judge

David Kimo Frankel,
Plaintiff-Appellant, pro se.            /s/ Sonja M.P. McCullen
                                        Associate Judge
William J. Wynhoff,
Deputy Attorney General,
for Defendant-Appellee
State of Hawaiʻi.

Jennifer A. Lim,
William M. Harstad,
Derek B. Simon,
(Carlsmith Ball),
for Defendant-Appellee
Resorttrust Hawaii LLC.

OPINION BY HIRAOKA, J.
CONCURRING IN PART AND DISSENTING IN PART

I concur that the public trust doctrine applied to BLNR's 2018 decision-making on Resorttrust's HRS § 171-55 permit application because Lot 41 is ceded land.[1]  I also concur that the agency record should let a reviewing court determine whether BLNR followed proper procedure and considered appropriate factors for issuing or continuing an HRS § 171-55 permit during a public meeting.  But I respectfully dissent from the majority's holding that BLNR did not fulfill its public trust duty regarding Lot 41. In my view, the record contains uncontroverted evidence showing that BLNR followed proper procedure for decision-making in a public meeting and acted as a reasonably prudent fiduciary of the public trust by beginning with a presumption favoring public use, access, and enjoyment; considering alternatives; and applying public trust principles to its decision-making on Resorttrust's permit application.  I would affirm the order granting BLNR's motion for summary judgment, but for reasons other than those stated by the circuit court.  See Reyes v. Kuboyama, 76 Hawaiʻi 137, 140, 870 P.2d 1281, 1284 (1994) (stating that "where the circuit court's decision is correct, its conclusion will not be disturbed on the ground that it gave the wrong reason for its ruling").

---

[1]  Today's opinion should only apply to BLNR's 2018 decision to approve Resorttrust's 2019 permit.  That was the only subject of Frankel's complaint.  Frankel filed an amended complaint after the circuit court granted BLNR's motion for summary judgment.  The amended complaint added a claim that BLNR breached its public trust duties in October 2019 by approving a revocable permit for 2020.  The parties did not move for summary judgment on the new claim, the circuit court entered no order on that claim, and the First Amended Final Judgment dismissed all claims that were not adjudicated.

**(1)** As the majority notes, the supreme court has stated, "any balancing between public and private purposes begin[s] with a presumption in favor of public use, access, and enjoyment." Waiāhole I, 94 Hawaiʻi at 142, 9 P.3d at 454. The majority states, "[t]here was nothing in the September 2018 staff submittal to show that the Board began with the presumption in favor of public use." In my view, the majority's focus on Lot 41 disregards the broad scope of BLNR's public trust duty, which "requires planning and decisionmaking from a global, long-term perspective." Id. at 143, 9 P.3d at 455.

The 2018 staff submittal was not the only evidence before the circuit court. In a 2011 public meeting, BLNR approved a DLNR request "to designate additional properties for income generation to support the management of lands under the jurisdiction of the Land Board." Lot 41 was one of those properties. The February 25, 2011 DLNR staff submittal — a matter of public record — stated that staff reviewed "over 1,300 leases, permits, licenses, etc., managed by [DLNR's] Land Division." Staff also reported that "revenues generated from these additional properties are projected to result in approximately $697,000 of additional revenue for the SLDF[2] to

---

[2] DLNR's Special Land Development Fund, or SLDF, funds "planning, development, management, operations, or maintenance of all lands and improvements under the control and management of" BLNR, "management, maintenance, and development of trails and trail accesses under the jurisdiction of" DLNR, "protection, planning, management, and regulation of water resources under chapter 174C [(the State Water Code)]," "invasive species control and mitigation by the invasive species council under chapter 194," and "reforestation and sediment run-off mitigation," among other DLNR functions. HRS § 171-19 (2011 & Supp. 2016).

2

help fund the Department's efforts to manage and protect the State's cultural, historic and natural resources."  The September 2018 DLNR staff submittal stated that Lot 41 was zoned for urban use but was "unsuitable for public auction lease" because of the "site issues" described in the submittal.  This shows that BLNR did "begin with a presumption in favor of public use, access, and enjoyment" for *all* "lands and improvements under [its] control and management[,]" HRS § 171-19(a)(2); balanced the need to generate revenue to fund the SLDF; and decided that Lot 41 should be used to generate income that would fund global, long-term protection of *all* public lands.

**(2)**  Citing Waiāhole I, 94 Hawaiʻi at 171, 9 P.3d at 483, the majority notes that BLNR must "consider practicable alternatives" when compromising a public trust resource.  The majority then states BLNR did not show "it considered alternate sites upon which Resorttrust could place the items it wanted to place on ceded land."  In my view, the majority's focus on alternatives "such as asking [Resorttrust] to place the items on its own property" instead of on Lot 41 is also too narrow.  The record shows that BLNR considered over 1,300 alternatives before deciding that Lot 41 (among others) should be used for "income generation to support the management of lands under the jurisdiction of the Land Board."  Cf. HRS § 171-55 (2011) (requiring that temporary revocable permits be issued "under conditions and rent which will serve the best interests of the State").  Thus did the record show that BLNR did "consider

3

practicable alternatives" before compromising exclusive public use of Lot 41.

**(3)** The majority states that BLNR "did not make explicit findings showing it fulfilled these three procedural requirements in executing its public trust duties." Two of the three cases cited by the majority — Waiāhole I and Kauai Springs — involved contested case hearings where the agency was required by HRS § 91-12 to make findings of fact. There is no similar statutory requirement for agency decisions made in public meetings. The third case, Carmichael, involved a decision made in a public meeting. The supreme court still quoted Kauai Springs to support its statement that "BLNR must make findings 'sufficient to enable an appellate court to track the steps that the agency took in reaching its decision.'" Carmichael, 150 Hawaiʻi at 567, 506 P.3d at 231.[3] But the court prefaced its statement by the qualifier, "[w]hile we do not fully set out the scope of the BLNR's duty to make the requisite findings, we note that the duty may vary in conjunction with the resources implicated." Id. And as the majority acknowledges, "even in the absence of explicit public trust findings in the agency's [contested case] decision, the decision may nonetheless be upheld if the public record reflects an application of the public trust principles." In re MECO, 150 Hawaiʻi at 540, 506 P.3d at 204; see also Sierra Club v. Bd. of Land & Nat. Res., 154 Hawaiʻi 264,

---

[3] The quote from Kauai Springs, 133 Hawaiʻi at 173, 324 P.3d at 983, cited Kilauea Neighborhood Ass'n v. Land Use Commission, 7 Haw. App. 227, 751 P.2d 1031 (1988), which also involved a contested case hearing.

282 n.19, 550 P.3d 230, 248 n.19 (App. 2024) ("When BLNR met on November 13, 2020, there was no statute, rule, or judicial precedent requiring that BLNR make written findings to support decisions made during public meetings. We note that for decisions made during a public meeting, rather than after a contested case hearing, BLNR could refer to its staff submittals or other evidence in the meeting record to support its decision. The meeting record and minutes should be sufficient for an appellate court to track the agency's steps."), cert. granted, No. SCWC-22-0000516, 2024 WL 3378462 (Haw. July 11, 2024).

Here, BLNR did not simply give Resorttrust carte blanche to use Lot 41 for its own purposes, to the exclusion of the public. BLNR imposed conditions on Resorttrust's permit. Resorttrust had to obtain required City permits and pay real property tax assessed on Lot 41. Resorttrust could not indiscriminately fill Lot 41 with beach chairs, umbrellas, or other specified items; they could be placed on Lot 41 only if "the user is physically present or such items have been placed on [Lot 41] at the request of the user." Resorttrust had to create and maintain two twenty-foot wide pathways mauka-to-makai[4] for public access. It had to maintain the public beach makai of Lot 41 at its own cost. Weddings, surf lessons, and kayaking or boating activities — which would monopolize an inordinate amount of space — were not allowed. Resorttrust had to let the public use Lot 41 "to the extent the area is not occupied for a use

---

[4]      *Mauka* means toward the mountains. *Makai* means toward the ocean.

allowed under the Permit." In my view, BLNR's imposition of these conditions shows it considered, and complied with, its duty to protect the public's use of the trust resource while balancing the need to use the urban-zoned land for income generation.

**(4)** The issue before the circuit court was whether BLNR followed proper procedures and considered the appropriate factors in making its decision on Resorttrust's application. That "is a question of law, and will be reviewed de novo." Kia'i Wai v. Dep't of Water, 151 Hawaiʻi 442, 454, 517 P.3d 725, 737 (2022). "As in other cases, agency decisions affecting public trust resources carry a presumption of validity." Id. at 455, 517 P.3d at 738 (quoting Kauaʻi Springs, 133 Hawaiʻi at 164, 324 P.3d at 974). When deciding whether an executive-branch agency followed proper procedures and considered the appropriate factors in its decision-making, a court cannot substitute its judgment about the application of public policy for that of the agency. "[L]ike the federal government, ours is one in which the sovereign power is divided and allocated among three co-equal branches." Tax Found. of Haw. v. State, 144 Hawaiʻi 175, 190, 439 P.3d 127, 142 (2019) (quoting Trs. of the Off. of Hawaiian Affs. v. Yamasaki, 69 Haw. 154, 170-71, 737 P.2d 446, 455-56 (1987)). "A court's domain is the law, and judges should recognize the limits of their expertise." Rosehill v. State, 155 Hawaiʻi 41, 59, 556 P.3d 387, 405 (2024). A court is not "authorized to substitute its judgment about the application of public policy to the facts for that of the agency, which is constitutionally delegated that power." Sierra Club, 154 Hawaiʻi

6

at 284, 550 P.3d at 250. Nor should a court reweigh the evidence considered by an expert agency dealing with a specialized field. Sierra Club v. D.R. Horton-Schuler Homes, LLC, 136 Hawaiʻi 505, 522, 364 P.3d 213, 230 (2015).

Here, the legal issue of whether BLNR followed proper procedures and considered the appropriate factors in its decision-making implicates the facts surrounding the decision-making. In my view, the uncontroverted material facts in the record show that BLNR followed proper procedure for decision-making in a public meeting; began with a presumption favoring public use, access, and enjoyment for all DLNR-managed land; considered alternatives, both for the generation of income and for preserving the public's ability to use Lot 41; and applied public trust principles to its decision-making on Resorttrust's permit application. Absent a constitutional or statutory violation, BLNR's decision carries a presumption of validity and it is not a court's function to judge whether the decision itself was right or wrong. I would therefore affirm the order granting BLNR's motion for summary judgment, but for reasons other than those stated by the circuit court.

/s/ Keith K. Hiraoka
Associate Judge